UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

WOMAN'S HOSPITAL FOUNDATION

VERSUS

NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION, et al.

CIVIL ACTION

NO. 11-cv-00014

## RULING ON MOTION TO DISMISS

Before the Court is a motion (Doc. 20) by defendants National Public Finance Guarantee Corporation ("National") and Financial Guaranty Insurance Company ("FGIC") to dismiss plaintiff Woman's Hospital Foundation's ("WHF") complaint for breach of contract. WHF filed an opposition (Doc. 24), and defendants submitted a reply (Doc. 26). Oral argument was requested by WHF, but the Court finds it unnecessary. Jurisdiction exists pursuant to 28 U.S.C. § 1332 following removal from state court.

I.

The following facts are taken from WHF's complaint and the documents it incorporates by reference.

WHF operates as a non-profit hospital providing the largest amount of obstetric, neonatal, and gynecological services in Louisiana. In order to fund renovations to its 40 year-old facility, in 2005 WHF contracted with the Louisiana Public Facilities Authority ("the Authority") to issue nearly $40 million in tax-exempt bonds on its behalf ("the 2005 bonds"). The Authority issued the bonds and loaned the proceeds from the 2005 bonds to the Hospital pursuant to their loan agreement. The Hospital agreed to make monthly payments on the principal and interest of the bonds to the Bank of New York Trust Company ("New York Trust"), the trustee the Authority contracted with to administer the loan agreement. WHF and New York Trust separately entered

1

into a "Master Trust Indenture," a document which created terms and conditions upon which WHF could assume additional long term debt.

At the same time, WHF purchased a bond insurance policy from FGIC. WHF paid an up-front, prepaid premium for FGIC's guarantee of WHF's payment to the 2005 bondholders. The insurance agreement they signed sets forth the duties and obligations between them. It provides for conditions under which WHF could incur additional debt, conditions that were more onerous than those imposed by the Master Trust Indenture WHF agreed to with New York Trust. The agreement also conditions certain actions WHF might otherwise take with FGIC's prior written consent.

In September 2008, FGIC reinsured its WHF insurance policy relating to the 2005 bond issuance with National.[1] The reinsurance agreement between FGIC and National allowed National to stand in FGIC's shoes for purposes of enforcing FGIC's insurance agreement with WHF.

Notwithstanding WHF's renovations to its facility financed by the 2005 bonds, it outgrew that facility. Sometime in 2008, it began contemplating an entirely new facility and planned to issue bonds in January 2010 in the principal amount of $350,000,000 ("the 2010 bonds"). WHF complied with the additional debt tests set forth in both its Master Trust Indenture with New York Trust and its insurance agreement with FGIC/National.[2]

In December 2009, WHF began negotiating with National to obtain its consent to the additional debt undertaking the 2010 bonds would represent. While the parties conducted

---

[1] The original transaction occurred between FGIC and MBIA, another bond insurer. Subsequently, MBIA transferred its public finance portfolio (including the reinsurance agreement involved here) to its subsidiary, MBIA Illinois, which later changed its name to Nation Public Finance Guarantee Corporation.

[2] Since, at this point, National had taken over enforcement of the insurance agreement, all subsequent references to WHF's bond insurer will refer to National instead of FGIC, even though FGIC and not National entered into the agreement with WHF.

substantial negotiations, National did not consent in the timeframe WHF thought its bond issuance required. Specifically, while WHF thought National would give consent if it agreed to additional covenants, during negotiations National desired to visit the site of the proposed new hospital. Therefore, WHF resolved to pay back the entirety of the balance on the 2005 bonds in order to free it to issue the 2010 bonds on time without the impediments presented by the Master Trust Indenture or the insurance agreement. Through WHF's attempts to obtain National's consent it alleges National wrongfully withheld, along with its added expenses in paying off the 2005 bonds ahead of schedule, WHF alleges damages in excess of $2.5 million.

II.

In December 2010, plaintiff WHF filed this action in Louisiana state court (Petition, Doc. 1-2), which defendants removed to this Court in January 2011 (Doc. 1). The action alleges four causes of action under Louisiana law: (1) breach of the insurance agreement due to National's withholding of consent, notwithstanding WHF's compliance with the additional long-term debt test set forth in that agreement; (2) breach of the defendants' duties of good faith by failing to provide consent without any basis; (3) a claim for abuse of rights based on the improper motives and purposes behind the withholding of consent; and (4) detrimental reliance based on National's intimations that it would consent which it later withheld after significant expenditures by WHF attempting to obtain that consent.

In February 2011, defendants filed a motion to dismiss (Doc. 5), but that motion was dismissed without prejudice while the parties pursued settlement (*see* Order, Doc. 15). After settlement efforts did not succeed, however, defendants renewed their motion to dismiss. (Doc. 20).

In essence, defendants contend the insurance agreement provisions requiring consent give them an unqualified right to deny consent, which necessarily defeats the breach of contract claim. They further contend that their withheld consent was based on prudent economic considerations that cannot, as a matter of law, show bad faith or an abuse of rights. Finally, they claim plaintiff's own pleading contradicts any possible detrimental reliance.

In support of its claims, WHF argues the additional debt tests were inserted into both the Master Trust Indenture and the insurance agreement in order to provide, at worst, a standard by which consent should be judged and, at best, an exception to the consent requirement.

### III.

Pursuant to Fed. Rule Civ. P. 12(b)(6), on a motion to dismiss for failure to state a claim, the Court accepts all well-pleaded, non-conclusory facts in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A complaint that pleads facts merely consistent with a defendant's liability "stops short of the line between possibility and plausibility." *Id.* at 557. When well-pleaded factual allegations populate the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1950. Courts may consider not only the complaint itself, but also documents attached to the complaint or documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The facts in the complaint are viewed collectively, not scrutinized in strict isolation. *Id.* Courts are permitted to take public records and others matters

4

of judicial notice into account when evaluating a motion to dismiss. *Hall v. Hopkins*, 305 Fed.Appx. 224, 227-28 (5th Cir. 2008); *Davis v. Bayless*, 70 F.3d 367, 372 n. 3 (5th Cir. 1995).

IV.

While WHF brings four separate claims against the defendants, they all hinge on how the Court interprets the consent provisions of the insurance agreement. If the consent requirements are unqualified, defendants did not breach the agreement by not consenting. Thus, they would not have acted in bad faith, and likely would not have abused their rights or provided any statement on which WHF could reasonably rely. Conversely, if the additional debt test qualifies the consent provisions of the agreement, then WHF has likely stated plausible claims. Thus, at present the case reduces to how the provisions of the insurance agreement interact with each other.

A.

Article II of the insurance agreement sets forth, among other things, the covenants WHF owes to the bond insurer. (Doc. 20-3, p. 5). Two sections are of particular import. The first is Section 2.2(f), which lays out a more stringent additional debt test than the Master Trust Indenture requires. (*Id.*, pp. 7-10). The second is Section 2.6, which subjects any amendment or supplement to the loan transaction documents to the prior written consent of the bond insurer. (*Id.*, p. 12). The insurance agreement defines the loan transaction documents to include, *inter alia*, the 2005 bonds, the 2005 note, the loan agreement, the Master Trust Indenture between WHF and New York Trust, and the bond trust indenture between the Authority and New York Trust. (*Id.*, § 1.1, p. 3). In fact, the Supplemental Master Trust Indenture No. 1 (Doc. 20-9) between WHF and New York Trust explicitly confirms in Section 5.10 that "anything contained in … the Master Trust Indenture to the contrary notwithstanding, [New York Trust] and [WHF]

5

shall not supplement or amend the Master Trust Indenture, this Supplemental Indenture or the Assignment without the prior written consent of the Bond Insurer." (Doc. 20-9, § 5.10, p. 9).

WHF concedes its 2010 proposed bonds required amending and/or supplementing the Master Trust Indenture to provide, for instance, more mortgaged property as security for the bond insurer's provision of the policy. (Memo. in Opp., Doc. 24, p. 11). It simply contends the bond insurer had no right to withhold written consent under Section 2.6 because the requested supplement to the Master Trust Indenture satisfied the additional debt test in Section 2.2(f) of the insurance agreement.

However, the Court finds the insurance agreement plainly and explicitly provides for the bond insurer's right to consent to any change to the Master Trust Indenture. Moreover, the right to consent, as written, admits of no qualifications or exceptions. It is contained in a separate section of the insurance agreement and does not mention the additional debt test provisions. As a sophisticated party, WHF had the ability to negotiate for the right of the bond insurer to consent based on more objective criteria, but it failed to do so.[3] The Court finds nothing in the insurance agreement implying that satisfaction of the debt test in Section 2.2(f) compelled the bond insurer to consent to the amendments to the Master Trust Indenture.

Contrary to WHF's position, giving full force and effect to Section 2.6's unqualified right to consent does not render Section 2.2(f) meaningless. As Section 2.2 of the insurance agreement itself states (Doc. 20-3, p. 7) and Section 4.12 of the Master Trust Indenture confirms (Doc. 20-4, p. 30), WHF was permitted to incur some new debt without seeking consent or

---

[3] Indeed, the parties included a separate consent provision tailored to Section 2.2 itself, which required WHF to comply with the terms of the covenants it made in favor of the bond insurer unless it received written consent from the bond insurer. The parties were thus quite capable of either inserting a more detailed consent provision into Section 2.6 or modifying the Section 2.2 consent provision, either of which could have mandated conditions on which consent must be granted.

modifying to the Master Trust Indenture; however, if the debt to be incurred rose above certain levels, the Master Trust Indenture required amendment, which in turn required the consent of the bond insurer. Thus, the text of the agreement plainly and unambiguously permits the bond insurer to grant or withhold consent irrespective of WHF's compliance with Section 2.2(f). *See* La. C.C. art. 2046 (requiring enforcement of clearly written contracts that lead to no absurd consequences); La. C.C. art. 2047 (mandating that courts construe words in a contract according to their plain meaning). WHF seeks to add a stipulation the parties did not make at the outset but it wishes to insert in hindsight. *See Lloyd's of London v. Transcontinental Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996). The breach of contract claim therefore has no merit, and National's motion to dismiss this claim is therefore granted with prejudice.

B.

Louisiana law requires contracts to be performed in good faith. La. C.C. art. 1983. While the Code does not define good faith, comment (b) to La. C.C. art. 1997 defines "bad faith" as "an intentional and malicious failure to perform." Louisiana courts have analyzed performance based on the dichotomy between good faith and bad faith without resort to any middle ground. *Cope v. CitiMortgage, Inc.*, No. 2:10-CV-922, 2010 WL 4976868, at * 3 (W.D. La. Dec. 1, 2010). Thus, to breach the duty of good faith, there must be an intentional and malicious failure to perform. *Id.* When a party does precisely what the express terms of an agreement permit it to do, that party cannot as a matter of law be acting in breach of the implied covenant of good faith and fair dealing. *Amoco Prod. Co. v. Texas Meridian Resources Exploration Inc.*, 180 F.3d 664, 669-70 (5th Cir. 1999); *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 298 (5th Cir. 1997).

7

Because the Court has determined the bond insurers acted within their rights under the insurance agreement in exercising their right to withhold consent, the Court finds as a matter of law that they cannot have acted in bad faith. The motion to dismiss is therefore granted with prejudice on this claim.

C.

Under Louisiana's abuse of rights doctrine, the holder of a right is liable to a party against whom the right is exercised if one of the following is present:

(1) The predominant motive for exercise of the right is to cause harm;
(2) There is no serious or legitimate motive for exercise of the right;
(3) The exercise of the right violates moral rules, good faith, or elementary fairness; or
(4) The exercise of the right is for a purpose other than that for which it was granted.

*Steier v. Heller*, 732 So.2d 787, 791 (La. App. 2d Cir. 1999). Because application of this doctrine renders unenforceable rights otherwise subject to judicial protection, this doctrine has been applied sparingly to only limited circumstances. *Id.* at 790-91. Thus, when a party has a legitimate interest in exercising a contractual right, he may do so even if it causes harm to another, but if the party does not have a legitimate and serious interest in exercising the right, and doing so would bring unnecessary harm to another, the doctrine of abuse of rights will bar exercise of the contractual right. *Massachusetts Mutual Life Ins. Co. v. Nails*, 549 So.2d 826, 829 (La. 1989).

WHF brings nothing more than conclusory allegations relating to this claim. (*See* Petition, Doc. 1-2, ¶ 38). WHF does not specify how the bond insurers would be motivated to cause it economic harm. WHF does elsewhere contend the bond insurers were motivated to cause it to defease the 2005 bonds ahead of schedule in order for Nation to realize the prepaid premium for the insurance policy without the risks of default ever materializing. If so, that

8

appears a legitimate business motivation to use contractual leverage provided by the insurance agreement to reduce the risk of WHF falling into default by delaying payments on the 2005 bonds due to the acquisition of more debt. Use of this type of economic weapon, negotiated for at arm's length with a sophisticated party, does not fall into that narrow class of cases calling for relief based on an injurious and arbitrary exercise of a contractual right. *Cf. Truschinger v. Pak*, 513 So.2d 1151, 1154-55 (La. 1987) (finding no abuse of rights when lessor refused to consent to lessee's proposed sublease if lessor's primary motive was economic).

Moreover, as WHF's complaint shows, the bond insurers never irrevocably refused consent. (*Id.*, ¶¶ 26-30). Rather, in the course of negotiations, National desired to conduct a site visit of the proposed new hospital. (*Id.*, ¶ 29). WHF interpreted this as a delaying tactic, paid off the 2005 bonds, and went ahead with the 2010 bond issuance. (*Id.*, ¶ 34). Even taking WHF's allegations as true, it is difficult to say that a month's worth of negotiations occurring over two major holidays in December 2009 and January 2010 regarding a $350 million bond offering almost ten times larger than the previous bond offering could reasonably be interpreted as intractable stonewalling. Conducting due diligence on such a large business deal, even if it took more time than WHF wished, does not amount to a violation of moral rules or elementary fairness.[4]

Finally, the Court cannot say the exercise of the right was for a purpose other than that for which it was granted. The Louisiana Supreme Court has already determined that at least one purpose of consent provisions is the maintenance of control. *Truschinger*, 513 So.2d at 1155. (lessor's refusal to permit sublease exercised for proper purpose of maintaining control over who leases property). In the same vein, National in this case was entitled to refuse consent in order to

---

[4] Since National validly exercised its contractual right, as the Court has already noted *supra*, Part IV.B, that exercise cannot, as a matter of law, sink to the level of bad faith.

control, to the extent it could, the amount of debt WHF might undertake, an increase of which would heighten the risk of default on the 2005 bonds. Because WHF has not pleaded a plausible abuse of rights claim, the motion to dismiss that claim is granted with prejudice.

D.

Finally, WHF claims it detrimentally relied on National's representations that it would consent. Civil Code article 1967 provides: "A party may be obligated by a promise when he knew of should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." La. C.C. art. 1967. WHF's claim cannot survive as pleaded. First, its characterizations of National's representations do not appear to rise to the level of a promise. (*See* Petition, Doc. 1-2, ¶¶ 28-29). Specifically, WHF alleges National advised it would consent "but asked that the Hospital agree to additional covenants." (*Id.*, ¶ 28). Then once a first draft "was moving toward execution," National announced it desired a site visit. (*Id.*, ¶ 29). As alleged, National's consent appears to have been hinged on the insertion of additional covenants, and once the first draft of those covenants moved along, it further wished to visit the site of the proposed facility. Neither allegation shows a concrete, ripened promise to consent on which a reasonable person would rely.

Moreover, the insurance agreement's consent provision specifically calls for "prior *written* consent." (Doc. 20-3, § 2.6, p. 14). Article 1967 states "[r]eliance on a gratuitous promise made without required formalities is not reasonable." La. C.C. art. 1967. Likewise, article 1947 provides that "[w]hen … the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." La. C.C. art. 1947. Obviously, drafting a written consent agreement that ultimately did not come to fruition shows both parties expected to fulfill the writing requirement for the consent provision,

as called for by the insurance agreement.  In this circumstance, it is unreasonable as a matter of law to rely on an alleged oral promise to consent when the parties previously called for a written consent.  *Rogers v. Brooks*, 112 Fed.Appx. 729, 732-33 (5th Cir. 2004) (citing *Carter v. Huber & Heard, Inc.*, 657 So.2d 409, 411 (La. App. 3d Cir. 1995)); *JCD Marketing Co. v. Bass Hotels and Resorts, Inc.*, 812 So.2d 834, 840-41 (La. App. 4th Cir. 2002).  The motion to dismiss this claim must therefore be granted with prejudice.

V.

Accordingly, it is ORDERED that defendants' motion to dismiss (Doc. 20) the claims of plaintiff, Woman's Hospital Foundation, is hereby GRANTED with prejudice.

Signed in Baton Rouge, Louisiana, on March 20, 2012.

**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**